# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| AMERICAN SOCIETY OF ANESTHESIOLOGISTS, AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, and AMERICAN COLLEGE OF RADIOLOGY,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>   *Defendants.* | Case No. _____ |

## DECLARATION OF JENNIFER RALEY, MD

I, Jennifer Raley, MD declare as follows:

 1. I am a current member of the American College of Emergency Physicians ("ACEP"). I have been a member of ACEP for approximately twenty-four (24) years.

 2. I am licensed by the State of North Carolina as a physician, and I am in good standing. I am currently certified by the American Board of Emergency Medicine.

 3. In 1998, I received a Doctor of Medicine degree from St. Louis University School of Medicine, St. Louis, MO. I completed my medicine residency at the University of North Carolina, Chapel Hill in 2001.

 4. I have been practicing medicine in the field of emergency medicine for over twenty (20) years.

 5. Currently, I serve as an emergency physician and a full shareholder at Wake Emergency Physicians, P.A. ("WEPPA"), which is located at 210 Towne Village Drive, Cary,

NC 27513. WEPPA contracts with WakeMed in Raleigh, North Carolina as well as hospital systems in the surrounding Johnston, Nash, and Granville Counties respectively, to provide emergency medical services.

6.        As a WEPPA shareholder, the compensation that I receive is dependent, in large part, upon the revenues that WEPPA receives from patients and third-party payers, including insurance companies.

7.        Some of the patients that I treat are covered by a group health plan or a health insurance issuer offering group or individual health insurance coverage (collectively, "insurers").

8.        WEPPA has contracted with some, but not all, insurers as an "in-network" provider. When WEPPA is an in-network provider, I am an in-network provider.

9.        When a patient is covered by insurance, WEPPA's contracted billing company transmits the bills for my services to the insurer, and WEPPA directly receives payments from the insurer.

10.        Most patients, however, are not covered by a private insurer. Some are covered by Medicare or Medicaid. Others have no insurance at all (under federal law, emergency departments are obligated to treat every patient who seeks care, regardless of their insurance status).

11.        WEPPA also treats patients who have insurance, but WEPPA has not reached an in-network agreement with their insurers. These are "out-of-network" patients. WEPPA has diligently worked over the last decade to be in network with all of the major local insurers. Referencing our most recent contracts, WEPPA has been in network with Cigna for more than a decade, Blue Cross Blue Shield of North Carolina for nearly a decade, and UnitedHealthcare since 2014. WEPPA has been in network with Aetna for the past two years.

12.     Despite this focus on contracting, WEPPA nonetheless treats some "out-of-network" patients each month.  When WEPPA is an out-of-network provider, I am an out-of-network provider.

13.     I am aware that the United States Department of Health and Human Services, the United States Department of Labor, the United States Department of the Treasury, and the United States Office of Personnel Management recently published an interim final rule ("IFR") governing an independent dispute resolution ("IDR") process to determine how much reimbursement an insurer must pay for certain out-of-network items or services.  Under the IFR, the entities determining the amount of reimbursement must "presume that the [qualifying payment amount ("QPA")] is an appropriate payment amount" unless "credible information" is submitted by the provider or insurer "clearly demonstrating" that the QPA is "materially different from the appropriate out-of-network rate," unless the reimbursement offers submitted by the provider and the insurer are equally distant from the QPA but in opposing directions.  Requirements Related to Surprise Billing; Part II, 86 Fed. Reg. 55,980, 55,995 (Oct. 7, 2021).

14.     It is my understanding that the QPA is not reflective of the fair market value for emergency department care.  Accordingly, the IFR's "rebuttable presumption" in favor of the QPA will result in significantly lower reimbursement rates than WEPPA is currently receiving for out-of-network emergency department care.

15.     Because certified IDR entities have limited capability to consider other statutory factors (codified at 42 U.S.C. § 300gg-111(c)(5); 29 U.S.C. § 1185e(c)(5); 26 U.S.C. § 9816(c)(5)), the "rebuttable presumption" in favor of the QPA will tilt IDR deliberations in favor of the insurer.  If certified IDR entities were able to consider these factors, I would be better positioned to receive adequate and fair reimbursement for my out-of-network services.

16.     Therefore, the IFR's "rebuttable presumption" in favor of the QPA will adversely impact the out-of-network payments that WEPPA receives for my services that are subject to the No Surprises Act.  Because the compensation that I receive from WEPPA depends, in large part, upon the revenues we receive from insurers, the IFR will adversely impact my compensation.

17.     Moreover, I reasonably believe that the IFR's "rebuttable presumption" has and will continue to empower insurers to reduce WEPPA's/my in-network contracted rate with insurers or refuse to contract with WEPPA as an in-network provider.

18.     For instance, Blue Cross Blue Shield of North Carolina sent WEPPA a letter on November 5, 2021, stating that the IFR provides "enough clarity to warrant a significant reduction in [WEPPA's] contracted rate with Blue Cross NC."  Despite WEPPA and Blue Cross Blue Shield of North Carolina's almost decade-long contractual arrangement, Blue Cross Blue Shield of North Carolina determined—after the promulgation of the IFR—that WEPPA was an "outlier in-network provider with respect to rates."  Blue Cross Blue Shield of North Carolina's letter then asked that WEPPA (1) take an immediate 20% rate cut, and (2) negotiate a new, lower rate.  The letter stated that "with an interim [rate] reduction in place, we will not need to quickly terminate outlier contracts as a means of avoiding payment levels after January 1, 2022 that are significantly higher than the default out-of-network QPA."  It then stated that "[i]f we are unable to reach agreement on the reduction, our intention is to proceed with identifying and executing on terminations of outlier contracts where the out-of-network QPA will result in significant savings to the benefit of our customers."

19.     In addition, I have personally had conversations with representatives from UnitedHealthcare and Cigna in the last year where they have demanded immediate and significant rate reductions and specifically raised the No Surprises Act during the conversation.

UnitedHealthcare has given us notice that our contract will terminate on May 30, 2022.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief. Executed on December 22, 2021, in Raleigh, NC.

_____    12/22/2021
Jennifer Raley, MD                              Date